UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>United States of America</u>


        v.                          Criminal No. 09-cr-178-JD
                                    Opinion No. 2011 DNH 055

<u>Paul Kavalchuk, et al.</u>


O R D E R

Defendants Paul Kavalchuk, Peter Kavalchuk, and East West Trading Corporation ("East West")[1] were indicted on November 12, 2009, and charged, <u>inter alia</u>, with conspiring to traffic in counterfeit goods in violation of 18 U.S.C. §§ 371 and 2320, and trafficking and attempting to traffic in counterfeit goods in violation of 18 U.S.C. §§ 2 and 2320(a).  The defendants now move to suppress evidence allegedly seized during the execution of a search warrant from 2 Victory Lane in Rye, New Hampshire, which is the location of Paul Kavalchuk's home and East West Trading Corporation's place of business.[2]  The defendants also request an

---

[1]The indictment refers to East West as "Eastwest Trading Corporation."  The court adopts the defendants' version of East West's name, "East West Trading Corporation," as spelled in their motion to suppress (Doc. No. 61).

[2]Paul Kavalchuk and East West filed the motion to suppress on November 10, 2010.  (Doc. no. 61).  Peter Kavalchuk moved to join the motion to suppress. (Doc. no. 85).  The government had no objection, and the court granted the motion.

evidentiary hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978)
to contest allegedly false statements in the search warrant
affidavit.  The government objects to both the defendants' motion
to suppress and their request for an evidentiary hearing.

Background

The following facts are drawn from the affidavit submitted
by Senior Special Agent Donald A. Lenzie of the Department of
Homeland Security in support of the search warrant, except as
otherwise noted.  The additional facts are drawn from exhibits
submitted by the defendants with their motion.

Lenzie has worked as a special agent with the United States
Immigration and Customs Enforcement ("ICE"), formerly the United
States Customs Service, for more than 24 years.  In that
position, his duties consist of enforcing the Tariff Act and
other laws, rules and regulations governing the import and export
of goods and merchandise, and payment of duties and fees.  Lenzie
has conducted and participated in numerous complex, multi-
defendant investigations involving commercial fraud, money
laundering, drug trafficking and related financial crimes.

Beginning in January of 2008, during an investigation of
East West, Lenzie conducted several interviews of a cooperating
source of information ("SOI #1") who, in the course of an

unrelated investigation, previously had provided agents with
information about another New Hampshire company's business
practices of purchasing and distributing counterfeit computer
components.  During those interviews, SOI #1 told Lenzie that on
five or six separate occasions between September and October of
2007, SOI #1 met with "Lou" and an unidentified employee from
East West, at a residence located at 2 Victory Lane, to pick up
items purchased from East West by another company.  While on the
property, SOI #1 observed computer parts and boxes in a detached
garage on the property that was being used as a storage facility.
The computer parts and boxes bore the Cisco Systems, Inc. brand.
SOI #1 informed Lenzie that he believed the items he had picked
up from East West were in fact counterfeit.  In his affidavit,
Lenzie attested that he had corroborated information provided by
SOI #1 in the past and found it to be reliable.

    Around the same time as Lenzie was investigating East West's
activities in the United States, a supplier of East West,
Comstart Group Inc., was the target of an investigation in
Canada.  In 2007, Cisco purchased Cisco brand computer equipment
from Comstart through an undercover intermediary.  Cisco
engineers tested the items for authenticity and determined them
to be counterfeit.  In April of 2008, Cisco applied for and

obtained an "Anton Piller" civil order from a Canadian court,[3] which authorized Cisco to enter Comstart's Perkinsfield, Ontario, premises and to search for and seize any products or related materials with Cisco trademarks.  Cisco executed the order two days later and seized more than $1 million in counterfeit Cisco products and close to $4 million in Cisco packaging and labels.

Following the seizures, Paul Wilson, Comstart's owner and operator, sought to negotiate a settlement with Cisco.[4]  The parties agreed that any settlement would likely include Wilson's cooperation in ongoing investigations.  On April 9, 2008, "on the basis of the notion that [Cisco was] willing to negotiate and co-operate in good faith. . .," Wilson revealed to Cisco that East West was Comstart's "major purchaser."  (Mot. Suppress, Doc. No. 61, Ex. 5).  Five days later, Comstart e-mailed Cisco seven documents relating to communications between Comstart and East West.

On April 16, 2008, while Cisco and Wilson were still in the process of finalizing their agreement, Wilson attended a meeting

---

[3]"An Anton Piller Order operates as both an injunction and a civil writ of seizure."  <u>Freeman v. DirecTV</u>, 457 F.3d 1001, 1002 (9th Cir. 2006).

[4]The defendants provided copies of e-mails to show the settlement communications between Comstart and Cisco in support of their motion to suppress.  <u>See</u> Doc. 61, nos. 4-7, 10.  The government does not challenge the authenticity of the e-mails.

with Cisco's counsel and Corporal David Sutherland of the Royal Canadian Mounted Police ("RCMP").  Wilson indicated that he would like to assist law enforcement in any way that he could and would provide a witness statement.  Sutherland directed Wilson to craft the statement with his attorney.  Once Sutherland received the statement, he would ask follow-up questions and request supporting documents to corroborate the information. (Mot. to Suppress, Doc. No. 61, Ex. 3, p. 2).

On April 17, 2008, Wilson and Comstart's attorney, Andrew Mae, e-mailed Cisco's counsel to say that Wilson was largely satisfied with a draft of their agreement, but requested that the parties add a few additional provisions, including one providing that Cisco agree not to press criminal charges.  Mae added that Wilson had drafted two witness statements for the RCMP,[5] and that Mae would send those statements to Sutherland once Cisco responded concerning Wilson's requests.

The following day, Mae e-mailed Sutherland the witness statements, attachments to the statements and contact details for Wilson and Comstart, "based upon [Sutherland's] verbal confirmation" that "their [sic] will be no charges laid against

---

[5]Mae explained that Wilson had received a call from East West after drafting his first statement and so had written a second statement addressing that later conversation.

5

my clients . . . concerning their involvement with counterfeit
Cisco products. . . ."  (Mot. Suppress, Doc. No. 61, Ex. 9).
After reviewing the documents, Sutherland contacted Wilson to
clarify a few points in his statements.  Sutherland then
forwarded the entire package to Lenzie, along with a
supplementary statement taken during his interview with Wilson.

According to Wilson's statements, beginning in June, 2006,
Comstart shipped thousands of counterfeit computer-related
products to East West at 2 Victory Lane.  Wilson estimated that
the value of these products totaled more than $700,000.

Wilson provided further details about his business dealings
with East West.  He stated that Comstart had obtained its
counterfeit parts from China and imported them individually into
Canada to avoid problems with Customs.  Once Wilson received the
parts, he attached Cisco labels and packaged the parts along with
manuals in Cisco-labeled boxes.  Comstart shipped the products to
East West as whole products.

Wilson identified Paul and Peter Kavalchuk as the operators
of East West and also stated that he dealt with Paul's daughter,
Nicole Kavalchuk, and an employee named "Lou."  He said that East
West knew that Comstart purchased its products from China and
that it was "fully aware" that Comstart assembled the products
for shipment to East West.  (Mot. Suppress, Doc. No. 61, Ex. 2,

p. 8).  He stated that East West was also aware, based on their
many e-mails and conversations, that it was purchasing
counterfeit Cisco brand products from Comstart.  The parties had
agreed that Comstart's shipments to East West from Canada were to
be broken down into smaller shipments and sent by parcel post or
regular mail to avoid Customs scrutiny and seizure.

Wilson stated that between February 28, 2008, and March 14,
2008, Comstart sent ten shipments of counterfeit Cisco brand
computer equipment to East West, the last of which was delivered
on March 19.  On April 3, 2008, East West had submitted four
additional orders, for a total of 1,035 Cisco brand parts.  Soon
after Wilson received the orders, he received voice and e-mails
from Peter Kavalchuk inquiring into their status.

By that point, Wilson was cooperating with Cisco's legal
counsel.  As part of this cooperation, he exchanged several e-
mails and had telephone conversations with both Peter and Paul
Kavalchuk regarding the pending orders.  Wilson advised them that
he had had a family emergency and was still assembling their
orders by applying the labels and stickers to the products.[6]

---

[6]The warrant detailed one phone call, on April 17, 2008, in
which Paul Kavalchuk allegedly advised Wilson to be careful
because a company had been "busted" in Canada and Cisco was
clamping down.  (Mot. Suppress, Doc. No. 61, Ex. 2, p. 9).  The
defendants point out, and the government concedes, that in fact
Wilson made the statement, not Kavalchuk.

On April 24, 2008, Lenzie submitted his warrant application to search 2 Victory Lane to the magistrate judge.  In his attached affidavit, Lenzie relayed the information he had received from SOI #1, as well as the information Wilson had shared regarding Comstart's business relationship with East West. Lenzie's affidavit did not specifically mention Wilson's settlement negotiations with Cisco, or that, in supplying information to Sutherland, Wilson sought Sutherland's verbal agreement not to charge Wilson or Comstart for their role in importing or distributing counterfeit products.

The affidavit did detail Cisco's private investigation.  In the affidavit, Lenzie stated that he had reviewed a Counterfeit Summary Investigative Report prepared by Cisco in which the company explained that it had purchased products from Comstart and determined them to be counterfeit.  The affidavit recounted Cisco's search pursuant to the Anton Piller order, and it noted that Wilson "cooperated with Cisco representatives and ultimately the RCMP" following the seizures.  (Mot. Suppress, Doc. No. 61, Ex. 2, p. 7).  The affidavit stated that RCMP investigators had interviewed Wilson, who in turn had relayed Wilson's information to Lenzie.

The Lenzie affidavit also detailed other investigations involving Comstart in which Lenzie had participated.  It noted

8

that beginning in July of 2005, the United States Customs and Border Protection ("CBP") and ICE intercepted at least nine international shipments of counterfeit computer components from Comstart to two New Hampshire corporations, Direct WholeSale International and Tri-State Computers.  On July 27, 2006, the CBP intercepted a shipment of 90 counterfeit Cisco computer components that Comstart had shipped to Direct Wholesale International, and in March of 2007, Lenzie intercepted two packages containing a total of 200 counterfeit Cisco computer components destined for Tri-State Computers.  Agents obtained search warrants to search the corporations, as well as the residence of the president of both corporations, David Burrows. The searches resulted in the seizure of more than $500,000 in counterfeit Cisco, Intel and 3Com computer components.  According to the Lenzie affidavit, Burrows was Paul Kavalchuk's former business partner at East West.

Lenzie also led an investigation of PMT Partners, a company that was importing and distributing counterfeit computer products in Hampton, New Hampshire.  In January, 2006, ICE executed a search of PMT and seized more than $400,000 in counterfeit goods. At the time, Comstart was documented as a supplier of counterfeit Cisco items to PMT.

From these investigations, Lenzie stated that he knew that Comstart was a shipper of counterfeit computer components from Canada into the United States.  He explained that these investigations, as well as his knowledge and experience, had taught him that companies engaged in the sale of counterfeit computer-related equipment maintained business records for long periods of time and generally stocked levels of inventory to allow for immediate shipment upon receipt of an order.  He added that it was common for companies engaged in the sale of computer-related products over the internet to store the items at a residence or in a garage.

Lenzie stated in the affidavit that East West had been registered with the New Hampshire Secretary of State and with the CBP as an importer of record since 1999 and listed 2 Victory Lane as its business address.  He stated that he had learned that Paul Kavalchuk owned the property and had taken out a $475,000 commercial loan on the property, secured by "[a]ll interests in East West Trading Corporation."  (Mot. to Suppress, Doc. No. 61, Ex. 2, p. 6).  Lenzie advised that "Internet and other research reflect[ed] that the company [was] engaged in the wholesale and retailing of computers and computer peripherals and software." (Doc. No. 61, Ex. 2, p. 5).  He opined that there was probable

cause to believe that a search of the premises would yield
counterfeit computer equipment and related business records.

Based on the information contained in Lenzie's affidavit,
the magistrate judge issued a warrant on April 24, 2008,
authorizing the search of 2 Victory Lane for evidence of
trafficking in counterfeit goods.  In part, the warrant
authorized the search and seizure of "[a]ll . . . documents and
records relating to the importation, purchase, transportation,
storage and sale of computer hardware. . . ."  (Doc. 61, Ex. 13,
p. 4).

<u>Discussion</u>

The Fourth Amendment provides that "no Warrants shall issue,
but upon probable cause. . . and particularly describing the
place to be searched, and the persons or things to be seized."
U.S. Const. amend. IV.  The defendants argue that the warrant
application (1) failed to demonstrate probable cause and (2)
intentionally or recklessly omitted facts which, if included,
would have undermined the determination that probable cause
existed.  The defendants also contend that the warrant lacked
particularity.

The government objects, arguing that probable cause
supported the warrant and that the warrant met the Constitution's

particularity requirement.  Should the court find that either of these requirements were not met, the government argues that the Leon good-faith exception, set forth in United States v. Leon, 468 U.S. 897 (1984), applies.  The court addresses the defendants' arguments in turn.

A.   Probable Cause

The defendants contend that the Lenzie affidavit failed to establish probable cause for the search because it did not provide a sufficient basis for the magistrate to assess Wilson's credibility.  They also, very briefly, appear to argue that some of the information in the warrant was too stale to support a finding of probable cause.  The defendants further argue that the warrant contained several false statements and omitted certain information material to the magistrate judge's probable cause analysis, and they request a hearing under Franks v. Delaware, 438 U.S. 154 (1978) so that the false statements and omissions can be evaluated.

1.   Wilson's Credibility

In adjudicating a motion to suppress asserting a lack of probable cause, the court examines the affidavit "in a practical, common-sense fashion" to determine whether "the totality of the

circumstances disclosed in the supporting affidavits . . .
demonstrate a fair probability that contraband or evidence of a
crime will be found in a particular place." United States v.
Greenburg, 410 F.3d 63, 66-67 (1st Cir. 2005). "In a doubtful or
marginal case, the court defers to the issuing magistrate's
determination of probable cause." Id.

     "A statement from a source can constitute the basis for
probable cause, even if the source is previously unknown to the
officer, so long as there is a sufficient basis for crediting the
source's reliability." United States v. McFarlane, 491 F.3d 53,
57 (1st Cir. 2007). The First Circuit has assembled a non-
exhaustive list of factors for courts to consider in evaluating
the credibility of a source whose information provides the basis
for a warrant, including the informant's apparent veracity or
basis of knowledge, whether his or her statements are self-
authenticating, the extent to which investigating authorities
corroborated the informant's statements where reasonable and
practicable, and whether the affidavit includes the investigating
authorities' professional assessment of the facts related by the
informant. Greenburg, 410 F.3d at 67. None of these factors is
indispensable, and others might be relevant. United States v.
Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). "The task in
assessing the informant's credibility is not to determine

13

definitively whether the informant is lying or in error."
Greenburg, 410 F.3d at 69.  "Rather, a probable cause finding may
be based on an informant's tip so long as the probability of a
lying or inaccurate informer has been sufficiently reduced."  Id.

The defendants assert that the magistrate judge should not
have determined that Wilson's statements were credible, because
he had no track record of reliability and the affidavit did not
suggest that Lenzie had taken steps to corroborate the
information he received from the RCMP.

Wilson was named in the affidavit, a fact which enhances
his credibility because he could "be held responsible if [his]
allegations turn[ed] out to be fabricated. . . ."  Florida v.
J.L., 529 U.S. 266, 270 (2000).  He provided specific, detailed,
information based on his own dealings with the defendants,
including the names of the people with whom he dealt at East
West, the method by which the packages were shipped, the exact
number of shipments and parts that Comstart had delivered to East
West between February and March of 2008, and the number of
counterfeit parts that East West was still expecting to receive
from Comstart.  See Greenburg, 410 F.3d at 67 ("A specific,
first-hand account of possible criminal activity is a hallmark of

14

a credible tip.").[7]  Furthermore, through the information he

provided, Wilson admitted participating in criminal activity.

See id. ("When a self-incriminating statement is provided by an

informant whose identity is known to authorities, the statement

is more likely to be true because of the risk inherent in making

such a statement.")

The defendants contend that Lenzie failed to corroborate

Wilson's statement because, in his affidavit, he did not mention

that he had made any effort to speak directly with Wilson or to

view Comstart's business records before seeking the search

warrant.  Direct contact between an agent and an informant can

support the informant's reliability, Greenburg, 410 F.3d at 67,

but it is not the only way to do so.

Importantly, Lenzie corroborated Wilson's statement in

several ways.  Part of Wilson's statement was corroborated by SOI

#1, a confidential informant with a reliable track record, who

also had implicated East West for possibly trafficking in

counterfeit goods.  SOI #1's description of the Cisco brand

computer parts and the employee named "Lou" matched details

provided by Wilson.  Additionally, Lenzie confirmed that East

---

[7]Wilson's detailed statement was more likely to be reliable,
as the government points out, because he knew that Comstart's
business records had been searched by Cisco and were open to
inspection.

West was in fact an importer of record operating in New Hampshire and that it was engaged in the sale of computer products.

Lenzie also knew that Comstart had sold counterfeit Cisco products in the past.  He had reviewed Cisco's Counterfeit Summary Investigative Report, in which Cisco stated that engineers had tested Cisco brand computer equipment the company had purchased from Comstart and determined it to be counterfeit. He knew that Cisco had seized more than one million dollars in counterfeit Cisco products from Comstart's business premises in Ontario, Canada.  Additionally, he knew from previous investigations by the CBP and ICE that Comstart had sent counterfeit Cisco products to other computer parts dealers in New Hampshire.  It was reasonable for the magistrate judge to conclude that the fact that Wilson had engaged in similar schemes, coupled with the fact that East West imported the type of product Wilson sold, made it more likely that Wilson was telling the truth.[8]

_____

[8]The defendants argue that neither SOI #1's account nor the fact that Comstart had sent counterfeit goods to other New Hampshire computer parts dealers, alone, established probable cause that there were counterfeit goods on East West's business premises.  The court need not consider each piece of evidence independently, because probable cause determinations are made based on the totality of the circumstances.  United States v. McElroy, 587 F.3d 73, 78 (1st Cir. 2009).

Finally, the magistrate judge could consider Lenzie's experience and pertinent expertise in evaluating the authenticity of the details Wilson provided about his business dealings with East West.  <u>United States v. Barnard</u>, 299 F.3d 90, 95 (1st Cir. 2002).  In his affidavit, Lenzie stated that he had participated in numerous investigations resulting in the seizure of millions of dollars of counterfeit goods during his 24 years with ICE. Given Lenzie's experience, the magistrate judge could have relied, in part, on his decision to credit Wilson.

Given the specific and self-incriminating nature of the tip, the degree of corroboration provided by Lenzie's own investigation, and Lenzie's expertise in handling similar investigations, the magistrate judge had sufficient grounds to rely on Wilson's statement in his probable cause analysis.

Furthermore, the Lenzie affidavit provided a "substantial basis upon which to conclude that there was a fair chance" that counterfeit goods or evidence of a scheme to traffic in counterfeit goods would be found at 2 Victory Lane.  <u>Barnard</u>, 299 F.3d at 95.

The warrant was facially sufficient.

17

2.   <u>Staleness</u>

In a footnote and in one other brief reference in the text, the defendants cursorily state that some of the information in the warrant application was too old to be considered in assessing probable cause.  (Mot. to Suppress, Doc. no. 61 Ex. 1, p. 9 n. 7, p. 16).  The defendants have not developed their argument with respect to this issue, however, so it has been waived.  <u>See</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  In any event, the argument is without merit.  The warrant taken as a whole provided sufficient timely information to establish probable cause.

3.   <u>Franks Hearing</u>

The defendants claim that by failing to inform the magistrate judge specifically that Wilson had provided his statement pursuant to a settlement agreement with Cisco and the RCMP, the Lenzie affidavit omitted information that was material to the magistrate judge's probable cause analysis.  They further contend that the affidavit provided only false and misleading statements in support of the assertion that East West was aware that it was purchasing counterfeit products from Comstart, and

18

that these false statements regarding East West's knowledge undermined any inference of probable cause.  They request an evidentiary hearing to evaluate the alleged omission and false statements.[9]  "To obtain such an evidentiary hearing, the defendant must make 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause.'"  United States v. Cartagena, 593 F.3d 104, 112 (1st Cir. 2010)(quoting Franks, 438 U.S. at 155-56).  "[T]o determine . . . materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause."  Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005).

---

[9]The defendants also characterize as "omissions" Lenzie's failure to corroborate certain aspects of Wilson's statement. Because the court has concluded that Lenzie sufficiently corroborated Wilson's statement to establish probable cause, it need not revisit that question here.

a.   The Settlement Agreement

The defendants argue that the Lenzie affidavit intentionally
or recklessly failed to advise the magistrate judge that Wilson
and his lawyer crafted the statement as part of an undisclosed
settlement with Cisco, and that Wilson sought Sutherland's verbal
agreement that he would not be charged for his role in the
importation and distribution of counterfeit products before he
provided the statement to Canadian authorities.  The government
responds that any omission was not intentional or reckless,
because Lenzie did not know that Wilson had allegedly reached an
agreement with Canadian authorities regarding future prosecution
when he submitted his warrant application to the magistrate
judge.[10]   The government also argues that even if the magistrate
judge had known that Wilson had cooperated with authorities in
exchange for immunity from prosecution in Canada, this
information would not have undermined the magistrate's
determination of probable cause.

---

[10]The government submitted an affidavit to this effect with
its objection.  The defendants argue that even if Lenzie did not
have actual knowledge of Wilson's agreements in Canada, the court
should hold a Franks hearing to determine whether Sutherland's
knowledge must be imputed to Lenzie because of the joint nature
of their investigation.  They cite United States v. Shields for
the proposition that "the police cannot insulate a deliberate
falsehood from a Franks inquiry simply by laundering the
falsehood through an unwitting affiant who is ignorant of the
falsehood."  458 F.3d 269, 276 (3d Cir. 2006).

The court need not consider whether Lenzie's failure to
mention the alleged settlement agreement was intentional or
reckless, because it agrees with the government that more
specific information about Wilson's settlement with Cisco, or
about any immunity agreement he reached with the Canadian
government, would have been immaterial to the magistrate judge's
probable cause determination.  Even though it did not mention the
specific terms of the settlement with Cisco, the Lenzie affidavit
notified the court that Wilson only spoke with Canadian
authorities after Cisco's search of Comstart resulted in the
seizure of more than one million dollars in counterfeit Cisco
products.  It stated that Wilson "cooperated with Cisco
representatives and ultimately the RCMP," and that "Wilson was
interviewed by RCMP investigators, who, in turn, relayed the . .
. information to [Lenzie] relative to East West. . . ."  (Mot.
Suppress, Doc. No. 61, Ex. 2, p. 7).  This information was
sufficient, even without the specific terms of any settlement, to
alert the magistrate judge to the possibility that Wilson may
have spoken out of self-interest.

More importantly, the settlement did not alter the self-
incriminating nature of Wilson's statement.  Even if he were
immune from prosecution in Canada, Wilson was still vulnerable to
prosecution in the United States based on his statements about

crimes that had occurred in the United States.[11]  Additionally,
detailed information about Wilson's settlement with Cisco or
information about his alleged immunity from prosecution in Canada
would not undermine the other reasons for crediting his
statements, such as the specificity of his account and the
corroboration provided by other sources.

>    b.   Statements Regarding East West's Knowledge

The defendants argue that Lenzie intentionally included
false statements to persuade the magistrate judge that East West

---

[11]The defendants argue that Wilson's settlement agreement
with Cisco insulated him from prosecution in the United States
because it provided that Cisco would not seek to have any
authorities press charges against him or Comstart based on the
information he provided in his statement.  They also cite U.S.
Attorney Arnold Huftalen's statement to Wilson, upon questioning
him before the grand jury on May 27, 2009, that the government
did not intend to charge him as a criminal defendant in the
investigation.  The defendants argue that this statement is
evidence that Wilson's agreement with Cisco insulated him from
prosecution in the United States.

Wilson's private agreement with Cisco provided only that
Cisco would not press charges against Wilson.  It did not prevent
the United States from prosecuting him.  At the time Lenzie
signed his affidavit in support of the search warrant
application, there was no agreement between Wilson and the U.S.
government immunizing Wilson from prosecution.  The U.S.
Attorney's statement, made more than a year after Lenzie
submitted his warrant application, was irrelevant to the probable
cause calculus, as this intent was not known to Wilson at the
time he provided the self-incriminating information that formed
the basis for the warrant application.

knew the products it received from Comstart were counterfeit,
when in fact Lenzie had no proof that such was true.  They say
the Lenzie affidavit's assertion that East West knew that
Comstart purchased its products from China was misleading,
because, as Lenzie should have known, Cisco had manufacturing
facilities in China.  The defendants point out that the affidavit
alleged that e-mails and conversations exchanged between East
West and Wilson would establish East West's knowledge, but that a
later interview with Wilson during discovery revealed that
Kavalchuk was limited in his use of e-mails and did not appear to
incriminate himself in them.  They highlight that the affidavit
falsely stated that Kavalchuk at one point had warned Wilson that
a company had gotten "busted," presumably for selling counterfeit
product, and that he should be careful.  (Mot. Suppress, Doc. No.
61, Ex. 2, p. 9).  In fact, Wilson had made that comment, not
Kavalchuk.

It is not clear that the assertion that East West knew
Comstart was importing its Cisco products from China was
misleading.  The government argues that Lenzie believed this
information was significant to the investigation because he knew
that Cisco would not provide products to customers directly from
China but would first send them to a distribution center in
another country.  The government admits that Lenzie erred in

attributing the statement regarding the "busted" company to Kavalchuk.  It contends, however, that the single error does not undermine the indicia of reliability which provided the basis for a finding of probable cause.

Even assuming that all of the statements identified by the defendants were false or misleading and made recklessly or intentionally, "if the statement[s are] set to one side and the totality of circumstances evidenced in the balance of the affidavit supports a finding of probable cause, the evidence properly uncovered during the search need not be suppressed." United States v. Cochrane, 896 F.2d 635, 638 (1st Cir. 1990). The magistrate judge could reasonably conclude, based on Lenzie's redacted affidavit, that there was a fair probability that counterfeit products or evidence of trafficking in counterfeit products would be found on East West's property.

Because the defendants failed to make a substantial showing that the alleged false statements and omissions in question were material to the magistrate judge's finding of probable cause, they are not entitled to an evidentiary hearing on the matter.

B.   Particularity

The defendants argue that the warrant application failed to satisfy the particularity requirement of the Fourth Amendment

24

because its authorization to search and seize all East West documents and records generated from June 2006 to the present "relating to the importation, purchase, transportation, storage and sale of computer hardware. . . " was unconstitutionally overly broad.

The Fourth Amendment requires that a warrant "particularly" describe the place to be searched and the "person or things to be seized." U.S. Const. amend. IV. This requirement protects against "the wholesale rummaging through a person's property in search of contraband or evidence." United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999). The particularity requirement addresses two separate concerns: "whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take; and . . . whether the category as specified is too broad in the sense that it includes items that should not be seized." Id. (internal citation omitted).

The defendants contend that the warrant violated the Fourth Amendment's particularity requirement because it did not limit law enforcement's search and seizure of East West's business records to evidence of specific crimes. They suggest that the warrant could have more narrowly defined the items to be seized as evidence of counterfeit computer hardware, transactions with Wilson or Comstart, or Cisco product. Because East West is

25

engaged in the sale of computer hardware, the defendants assert,
the warrant, as written, opened all of East West's documents and
records to search and seizure.

The government asserts that the relevant documents could not
have been more precisely defined.  See Upham, 168 F.3d at 535
(holding that a warrant authorizing law enforcement to search
"any and all computer software and hardware" in a child
pornography case satisfied the Fourth Amendment's particularity
requirement, where it was "about the narrowest definable search
and seizure reasonably likely to obtain the images").

Where the government seeks to search and seize a company's
business records, the warrant is sufficiently particular if it is
limited to the aspects of the business the government has
established probable cause to believe are involved in criminal
activity.  United States v. Brien, 617 F.2d 299, 306-07 (1st Cir.
1980); see also United States v. Hershenow, 680 F.2d 847, 852
(1st Cir. 1982) (holding that a warrant permitting the seizure of
all of a doctor's accident patient files was sufficiently
particular, where the affidavit for the warrant demonstrated
probable cause to believe that the doctor's accident practice was
rife with fraud).

The Lenzie affidavit provided a basis for believing that
East West was extensively involved in the importation and sale of

counterfeit computer hardware.  The government's source, Wilson, supplied detailed information about providing East West with more than $700,000 worth of counterfeit computer hardware parts during the time period covered by the warrant and about the corrupt manner in which East West allegedly operated its computer hardware business.  The Lenzie affidavit thus established probable cause to seize all of East West's business records relating to its computer hardware business.

Even if the warrant had limited the government's search to evidence of counterfeit computer hardware, that limitation would not have restricted the scope of the government's search as a practical matter.  Agents still would have had to view all of East West's computer hardware business records to identify those involving counterfeit transactions.  The broader scope was also necessary because agents likely would not have been able to cull through the records and make such a determination on the spot. See Upham, 168 F.3d at 535.

The defendants appear to argue that the particularity requirement is more stringent when business records are found on a computer.  In support of this argument, they cite Tenth Circuit case law requiring that warrants for computer searches "affirmatively limit the search to evidence of specific federal crimes or specific types of material."  United States v. Otero,

27

563 F.3d 1127, 1132 (10th Cir. 2009)(quoting United States v. Riccardi, 405 F.3d 852, 863 (10th Cir. 2005)).

The First Circuit declined to adopt a similar rule for computer searches in Upham, however, when it held that "[a] sufficient chance of finding some needles in the computer haystack," as established by the probable-cause showing in the warrant application, justified law enforcement's seizure and subsequent off-premises search of a computer and all available disks. Upham, 168 F.3d at 535. The court reasoned that "a search of a computer and co-located disks is not inherently more intrusive than the physical search of an entire house for weapons or drugs." Id.

Even if the First Circuit were to adopt the Tenth Circuit's more stringent particularity requirement for computer searches, however, that requirement would not render the warrant at issue here unconstitutionally overly broad. The rule set forth in Otero and Riccardi prevents the use of warrants authorizing the general search of defendants' computers, without any reference to the types of documents sought. See Otero, 563 F.3d at 1133; Riccardi, 405 F.3d at 862. As the court noted in Riccardi, such a general warrant "permit[s] the officers to search for anything – from child pornography to tax returns to private correspondence," and thus "seem[s] to authorize precisely the

28

kind of wide-ranging exploratory search that the Framers intended to prohibit." United States v. Riccardi, 405 F.3d at 863.  Here, the warrant specifies the types of documents sought as East West's business records relating to its importation and sale of computer hardware.

The warrant's authorization of the search and seizure of all of East West's business documents "relating to the importation, purchase, transportation, storage and sale of computer hardware. . . " was not unconstitutionally overly broad.

C.   Good Faith Exception

The warrant authorizing the search of 2 Victory Lane was supported by probable cause and sufficiently particular in its scope.  Even if the warrant had failed to pass constitutional muster, however, the Leon good faith exception would apply.

United States v. Leon established a good faith exception to the exclusionary rule when a government agent relies on a warrant in objective good faith.  Leon, 468 U.S. at 919-20. "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in

the existence of probable cause."  <u>United States v. Robinson</u>, 359
F.3d 66, 70 (1st Cir. 2004)(quoting <u>Leon</u>, 468 U.S. at 926).

The defendants argue that Lenzie was dishonest or reckless
in preparing his affidavit and thus that the <u>Leon</u> good faith
exception does not apply.  They cite the same alleged false
statements and misrepresentations and omission of the settlement
agreement that they raised in support of their motion for a
<u>Franks</u> hearing.  They also highlight Lenzie's apparent failure to
follow up with Wilson personally and verify his statement before
submitting the warrant application.

As discussed above, the information about the settlement
agreement, as well as the statements regarding East West's
knowledge that it was importing counterfeit computer parts, were
immaterial to the finding of probable cause.  Although the
warrant does not state that Lenzie spoke to Wilson directly
before submitting his application, it was reasonable for him to
conclude that further verification was not necessary in this
case.  The warrant application provided ample reasons for
crediting Wilson's testimony.

The court finds that Lenzie's reliance on the warrant was
objectively reasonable.

30

Conclusion

For the foregoing reasons, the defendants' motion to suppress all evidence derived from the April 28, 2008 search of 2 Victory Lane, Rye, New Hampshire, (doc. no. 61), is DENIED.


SO ORDERED.


_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

March 31, 2011

cc:   Seth R. Aframe, Esquire
      William E. Christie, Esquire
      Steven M. Gordon, Esquire
      Arnold H. Huftalen, Esquire
      Richard F. Monteith, Jr., Esquire
      Robert J. Rabuck, Esquire