UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

     v.                                    Criminal No. 09-cr-178-JD

Paul Kavalchuk, et al.


O R D E R

    Defendant Peter Kavalchuk was indicted on November 12, 2009,
and charged with conspiring to traffic in counterfeit goods in
violation of 18 U.S.C. §§ 371 and 2320, trafficking and
attempting to traffic in counterfeit goods in violation of 18
U.S.C. §§ 2 and 2320(a), and making a false statement to a
federal agent in violation of 18 U.S.C. § 1001.  Peter Kavalchuk
now moves to suppress statements that he made to government
agents during the execution of a search warrant at 2 Victory
Lane, Rye, New Hampshire, which is both the place of business of
Peter Kavalchuk's employer, co-defendant East West Trading
Corporation ("East West"), and the residence of Peter Kavalchuk's
brother and East West's owner, co-defendant Paul Kavalchuk.  The
government objects.

    The court held an evidentiary hearing on the motion on March
15, 2011. ICE Special Agents Donald Lenzie, Bruce Gauthier, and
Gregory Squire testified for the government.  Peter Kavalchuk

testified for the defense, and the government and the defense stipulated to Nicole Maynard's testimony.

A.   <u>Facts</u>

The following facts have been proven beyond a preponderance of the evidence.

On April 28, 2008, eight ICE agents, a deputy sheriff of Carroll County, and three support personnel[1] conducted a search of 2 Victory Lane, pursuant to a search warrant, for evidence of trafficking in counterfeit goods and particularly, counterfeit Cisco Systems, Inc. computer parts.  The property searched consisted of a house and a two-story carriage house.  Lenzie led the search as the case agent.

Prior to executing the search, Lenzie held a briefing at Pease Air Force Base in Rockingham County, New Hampshire, for all of the agents who would assist with the search warrant.  Lenzie reviewed the items to be searched and seized pursuant to the warrant, and he gave the agents their assignments.  He stressed that the warrant was to be executed in a low-key manner.  Agents would not wear raid jackets, and they were not to walk around outside with guns and radios where neighbors could see them.

---

[1]The support personnel included a civilian ICE employee, a National Guard analyst, and an intern.

2

Lenzie instructed the team that once the agents had secured the scene, they should identify anyone on the premises and release them if they wanted to leave.[2]

The search team arrived at 2 Victory Lane at 9:45 a.m. and fanned out to cover various posts.  Lenzie and several other agents headed to the carriage house.  Lenzie knocked on the door.  Upon receiving no response, Lenzie entered the carriage house and climbed the stairs to an upstairs office.  There, he found three employees of East West: Peter Kavalchuk, Paul Kavalchuk's daughter, Nicole Maynard, and Lou Fladger.

Lenzie identified himself, displayed his badge and credentials, and explained that federal agents had a search warrant to search the premises.  He directed Kavalchuk, Maynard, and Fladger to leave their work stations and to sit at a table in the center of the office.  Lenzie asked Kavalchuk, Maynard, and Fladger for their identification, and they produced their driver's licenses.  Lenzie told the three East West employees that they were not under arrest at that time, but directed them not to make phone calls while agents were securing the property.  Lenzie then stated that he had to go to the house to make sure

_____

[2]Lenzie took notes of this pre-search briefing on the day of the search.  Next to the names of the agents and their respective posts, Lenzie wrote "possible girlfriend in res. 3-4 employees. ID/Release." (Gov. Ex. 7).

that it was secure, but that he would return to the carriage house shortly to explain what was happening in greater detail. Both Gauthier and Squire entered the carriage house office shortly before Lenzie headed to the house and remained with Kavalchuk, Maynard, and Fladger during Lenzie's absence.

In the house, Lenzie spoke with Donna Decotis, who identified herself as Paul Kavalchuk's girlfriend and produced her driver's license as identification. Lenzie gave Decotis the option of staying on the property or leaving while the search warrant was conducted. Decotis chose to leave. In notes he made during the search, Lenzie jotted down that he spoke with Decotis at 10:04 a.m., nineteen minutes after agents first arrived at 2 Victory Lane. Lenzie spoke briefly with the agents assigned to the house to verify that no one else was present.[3] He then returned to the carriage house office, where Kavalchuk, Maynard, and Fladger remained seated at the table. In all, Lenzie's trip to the house took no more than fifteen to twenty minutes.

Lenzie again explained to Kavalchuk, Maynard, and Fladger that agents were on the property to execute a search warrant, and he showed them a copy of the warrant. He told them that they

---

[3]Lenzie testified at the evidentiary hearing that it is his practice to secure the premises before executing a search warrant, primarily for the safety of officers and others who might be on the property.

were free to leave the property or could stay if they wanted, but
that if they did stay, they would be unable to work at their work
stations or on their computers because those items were subject
to the search.  Maynard and Fladger opted to leave.  Kavalchuk
asked if he could use an office phone to call Paul Kavalchuk, and
agents told him he could.[4]  After speaking with his brother,
Kavalchuk stated that he wished to stay until his brother
arrived.  Lenzie told Kavalchuk that he could call a lawyer, but
Kavalchuk said he would wait for his brother.

Maynard left first.  Lenzie accompanied Fladger downstairs.
When they reached Fladger's car, Lenzie spotted a Cisco-labeled
box on the floor of the passenger side of the vehicle.  Upon
Lenzie's request, Fladger consented to a search of his car.
Lenzie searched the car and seized the box.  According to
Lenzie's notes, Fladger left at 10:25 a.m., forty minutes after
the agents' arrival.

Lenzie then returned to the carriage house office.  He sat
next to Kavalchuk and discussed the items the agents sought
pursuant to the warrant.  One category of items listed in the
warrant was "[r]ecords of offsite storage facilities owned,
controlled, used or operated by East West Trading Corporation

---

[4]Agents did not monitor Kavalchuk's phone call.

. . . ." (Mot. to Suppress, Doc. 61, Ex. 13, p. 5).  Lenzie
asked Kavalchuk if East West had any offsite storage facilities.
Kavalchuk said no (hereinafter "first statement").  After their
conversation, Lenzie left Kavalchuk and checked on various agents
to guide them in their search.

At shortly after 11 a.m., a member of the search team
informed Lenzie that Paul Kavalchuk had arrived and was in the
carriage house with Peter Kavalchuk.  Lenzie intercepted the
brothers as they made their way to the house, and the three
walked to the house together.  Lenzie, Squire, and Peter and Paul
Kavalchuk then sat down at the kitchen table.  Lenzie first
reviewed the terms of the search warrant with Paul and stressed
that Paul was free to leave.  He also gave Paul the option of
calling an attorney.  Paul said he did not want to.

Lenzie then told the Kavalchuks that he was concerned that
agents were finding only limited amounts of inventory on the
property, when, based on Lenzie's knowledge of the investigation,
he would have expected to find hundreds of computer parts.
Lenzie asked again if East West had any offsite storage
facilities.  Peter Kavalchuk said that East West did not.  He
stated that inventory came in and went out the door, and that
they did not like keeping inventory on site (hereinafter "second
statement").  Paul Kavalchuk did not respond.

The search continued until 4:20 p.m.  During the search, the Kavalchuks were free to move between the house and the carriage house without restriction, but, so long as they remained on the property, they had to remain within view of an agent.[5]  They were free to use the phone.[6]

Both Peter and Paul Kavalchuk opted to stay on the property until the search's conclusion.  At no point did agents separate the Kavalchuks, physically restrain either Peter or Paul Kavalchuk, raise their voices, or brandish a weapon.  Neither Peter nor Paul Kavalchuk voiced concerns about how they were treated or how the search was conducted at any time during the day.  At one point, the Kavalchuks asked for permission to have an alcoholic drink, and agents told them they could.  The agents had pizza delivered to the property for lunch and offered some to

---

[5]When Peter Kavalchuk had to use the bathroom, an agent stood in the doorframe with the door propped open.

[6]Peter Kavalchuk's cell phone records, offered by the government as evidence, show that he made a call at 9:11 a.m., but that he did not use his phone again until 1:11 p.m., when he received a call (Gov. Ex. 5).  Kavalchuk testified that agents did not allow him to use his phone during the four hours it was inactive.  The court does not find this testimony credible.  By Peter Kavalchuk's own testimony, agents allowed him to call his brother early in the search and invited him to call an attorney. Kavalchuk had replied that he wanted to wait for his brother to arrive.  The court finds that Peter Kavalchuk's decision not to use his phone for four hours during the search was his own and was not imposed by agents.

the Kavalchuks, who declined.  Paul Kavalchuk spent part of the
search sitting in the living room, watching television.

Prior to leaving, Lenzie sat down with Paul Kavalchuk at the
kitchen table and presented him with a copy of the items seized.
Lenzie explained why the agents had taken certain items and gave
Paul a business card in case he or his lawyer had any questions
or wished to share any additional information.

## Discussion

Peter Kavalchuk moves to suppress the statements he made to
law enforcement agents during the April 28, 2008, search that
East West did not have any offsite storage facilities.  He
contends that he made the two statements while he was in custody,
but that agents did not advise him of his rights, as required
under Miranda v. Arizona, 384 U.S. 436 (1966), before questioning
him.  Therefore, he argues, the questioning was unlawful and the
statements must be suppressed.[7]

"'A person questioned by law enforcement officers after
being taken into custody or otherwise deprived of his freedom of

---

[7]At the evidentiary hearing, Lenzie testified that a
"combination" of the two statements formed the basis for the
charge against Peter Kavalchuk under 18 U.S.C. § 1001.  March 15,
2011, Tr. at 80.  The indictment refers to only one statement,
however. (Indictment, Doc. 1, p. 11).

action in any significant way must first' receive <u>Miranda</u>
warnings." <u>United States v. Mittel-Carey</u>, 493 F.3d 36, 39 (1st
Cir. 2007)(quoting <u>Stansbury v. California</u>, 511 U.S. 318, 322
(1994)(internal brackets and quotation marks omitted)).  "The
'ultimate inquiry' when determining whether a defendant was in
custody during an interrogation 'is simply whether there was a
formal arrest or restraint on freedom of movement of the degree
associated with a formal arrest.'"  <u>Id.</u>  The suspect's subjective
belief is irrelevant.  <u>Stansbury</u>, 511 U.S. at 323.  The court
considers whether, under the "totality of the circumstances," "a
reasonable person would have felt he or she was not at liberty to
terminate the interrogation and leave."  <u>Mittel-Carey</u>, 493 F.3d
at 39 (internal brackets omitted).

        The court considers the circumstances surrounding Peter
Kavalchuk's two statements in response to Lenzie's questions
about offsite storage facilities in turn.


A.   <u>The First Statement</u>

        Peter Kavalchuk's description of the circumstances
surrounding the first statement, in his testimony at the
evidentiary hearing, was substantially consistent with Lenzie's
testimony.  By Kavalchuk's account, Lenzie told Kavalchuk,
Maynard, and Fladger they were free to leave about twenty minutes

after agents first arrived at 2 Victory Lane.  Kavalchuk agreed
that at that point, agents also allowed him to call his brother
and told him he could call an attorney.

### 1.   Circumstances Surrounding First Statement

Kavalchuk testified, however, that Lenzie asked him whether
East West had remote storage facilities <u>before</u> Lenzie told him
and the two other East West employees they were free to leave.
He testified that as soon as agents arrived at the carriage house
and obtained driver's licenses from him and the two other East
West employees, they began searching the office.  Kavalchuk
stated that Lenzie left the office briefly for a few minutes,
returned to ask Peter Kavalchuk where his brother, Paul, was,
then allowed Peter to try to call Paul.  Kavalchuk testified that
after the phone call, agents asked for Kavalchuk's help in
opening a large safe on the first floor of the carriage house.
Lenzie led Kavalchuk downstairs, where Kavalchuk tried,
unsuccessfully, to help open the safe.  Lenzie then looked around
the carriage house, and asked whether East West had any off-site
storage facilities.  Kavalchuk told him no.  Kavalchuk testified
that Lenzie's initial request for identification, Lenzie's brief
trip to the house, and Lenzie and Kavalchuk's trip down to the

carriage house safe all occurred within the first ten to fifteen minutes of the search.

Maynard's stipulated testimony provided some support for Kavalchuk's account.  She would have testified that Kavalchuk briefly left the carriage house office with an agent before the three employees were told that they were free to leave.

Despite this limited support, the court finds that Kavalchuk's version of events is not credible.  First, Kavalchuk's account does not fit within the time line he described.  It would have been nearly impossible for Lenzie to have taken the employees' identifications, visited the house, returned to the carriage house, and visited the downstairs safe with Peter Kavalchuk, all within the first ten to fifteen minutes of the search.  In addition, Kavalchuk's account is inconsistent with the overwhelming evidence in the record suggesting that the agents' first priority was to secure the property for the search. Further, given security issues, Lenzie would not have led Kavalchuk downstairs to the safe before first conducting a sweep of 2 Victory Lane for weapons.[8]  The court thus accepts Lenzie's

---

[8]The court also notes that Kavalchuk's version of the facts at the evidentiary hearing differed from the version he presented in his motion to suppress.  In the motion, Kavalchuk states that he was interrogated while in the carriage house office, which is consistent with Lenzie's version of the facts.

11

version of events and finds that Lenzie told Kavalchuk that he was not under arrest, he was free to leave, and that he was free to call an attorney before Kavalchuk made his first statement that East West did not have any offsite storage facilities.

    2.   Custody

The court next considers whether Kavalchuk was in custody at the time he made his first statement under the circumstances that existed at the time of the statement.  The First Circuit has identified a non-exhaustive list of factors for courts to consider when custody is at issue, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987).

Although three to four agents were present in the carriage house at the time Kavalchuk made his first statement, only one agent, Lenzie, actually interrogated Kavalchuk.  Moreover, he was questioned in familiar surroundings, his place of employment and his brother's home, and he was not restrained.  The duration of the interrogation was no more than a few minutes – just long

enough for Lenzie to inquire about storage facilities.  These
factors suggest that Kavalchuk was not in custody.

        Most significantly, the character of the interrogation
surrounding the statement was decidedly low-key.  Lenzie did not
exert any pressure on Kavalchuk to talk.  Agents arrived on the
premises during normal business hours, and they did not wear
raid-jackets or brandish weapons.  Prior to inquiring about
storage facilities, Lenzie told Kavalchuk that he was not under
arrest, that he was free to leave, and that he could call a
lawyer.  See Locke v. Cattell, 476 F.3d 46, 53-54 (1st Cir.
2007)(finding that the fact that suspect was told at least five
times that he did not have to speak with police and that he was
free to leave was the most significant fact suggesting that the
interrogation was non-custodial); United States v. Lanni, 951
F.2d 440, 442-43 (1st Cir. 1991)(indicating that statements by
questioning officers that the defendant was free to leave tend
against a finding of custody).

        Peter Kavalchuk was not in custody when he first told Lenzie
that East West did not have remote storage facilities.  Cf.
Nishnianidze, 342 F.3d at 13-14 (affirming a finding of non-
custody, even though the suspect was not told that he was free to
leave, where the interrogation took place in the suspect's
apartment and lasted only thirty to forty-five minutes, and
agents did not make physical contact with the suspect or restrain

his movement).  Therefore, Kavalchuk was not entitled to <u>Miranda</u>
warnings, and no grounds exist to suppress the first statement.


B.    <u>The Second Statement</u>

     Peter Kavalchuk stated that he felt his movements were
restricted at the time he made the second statement.  In support,
he cites the day-long duration of the search and the fact that an
agent remained with him at all times and even stood in the door
frame when he used the bathroom.  Kavalchuk contends that the
facts in his case are "remarkably similar" to those presented in
<u>United States v. Bullins</u>, 880 F. Supp. 76 (D.N.H. 1995), in which
this court held that a suspect was in custody for purposes of
<u>Miranda</u>.

     In <u>Bullins</u>, federal agents obtained a search warrant to
search the defendant's home after receiving information that the
defendant, a convicted felon, was in possession of a .25 caliber
semi-automatic pistol and a .22 caliber semi-automatic pistol.
During the search, the agents separated the defendant from his
wife, directed the defendant to remain seated at the kitchen
table, and interrogated him while four to five agents, armed and
dressed in raid jackets, conducted the search.  Agents did not
tell the defendant that he was free to leave.  The court found
that these factors, along with the types of questions the agents
asked, evidenced a calculated effort to evade <u>Miranda</u>'s

                                 14

requirements and curtailed the defendant's freedom to a degree associated with a formal arrest.  880 F. Supp. at 79.

The facts in this case are significantly different from those presented in Bullins.  Lenzie explicitly told Kavalchuk that he was not under arrest, that he was free to leave, and that he could call an attorney prior to the interrogation.  Although at least one agent remained with Kavalchuk at all times,[9] agents did not separate Kavalchuk from his brother or direct him to remain in one location during the search.  See United States v. McCarty, 475 F.3d 39, 46 (1st Cir. 2007) (holding interrogation was non-custodial, where, although the suspect remained in the presence of two officers, he had been released from handcuffs and told he was free to leave).  Moreover, although the search spanned more than six hours, Lenzie's interrogation of Kavalchuk lasted no more than a few minutes.  There is no evidence that agents used subtle interrogation techniques, such as those present in Bullins, to elicit incriminating responses from Kavalchuk.  Agents did not physically restrain or threaten Kavalchuk at any point during the search, and the record indicates that the overall atmosphere of the search was relaxed.

---

[9]The requirement, which agents testified was for safety reasons and to ensure that no evidence was removed from the property, was reasonable.

In short, there was not a "restraint on freedom of movement of the degree associated with a formal arrest." McCarty, 475 F.3d at 46.  Peter Kavalchuk was not in custody the second time he told Lenzie that East West did not have offsite storage facilities, and no grounds exist to suppress this second statement.

Conclusion

For the foregoing reasons, the defendants' motion to suppress all statements made by Peter Kavalchuk during the April 28, 2008, execution of a search warrant at 2 Victory Lane, Rye, New Hampshire, (doc. no. 66), is DENIED.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

April 11, 2011

cc:  Seth R. Aframe, Esq.
     William E. Christie, Esq.
     Steven M. Gordon, Esq.
     Arnold H. Huftalen, Esq.
     Richard F. Monteith, Jr., Esq.
     Robert J. Rabuck, Esq.